**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**LUIS TELLEZ**, Personal
Representative for the Estate
of Benjamin S. Tellez, deceased,

Plaintiff,

vs.                                                    **No. 12cv0542 JCH/KBM**

**CITY OF BELEN** and
**SERGEANT GERALD ESPINOZA**,
a City of Belen Police Officer,
in his individual and official capacities,

Defendants.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on *Defendant Sergeant Espinoza's Motion for Qualified Immunity on Section 1983 Claims and Motion for Summary Judgment on State Law Claims and Defendant City of Belen's Motion for Summary Judgment on All Claims*, filed October 5, 2012 (Doc. 19).  Sgt. Espinoza seeks qualified immunity, and the City of Belen seeks summary judgment, in their favor on Plaintiff Luis Tellez's Fourth-Amendment claims brought on behalf of his deceased son's estate under 42 U.S.C. § 1983 for Sgt. Espinoza's allegedly unlawful use of deadly force; and both Defendants seek summary judgment on Tellez's tort claims for wrongful death brought under the New Mexico Tort Claims Act and the New Mexico Wrongful Death Act based on the same allegations. After reviewing the briefs and

evidence submitted by the parties, as well as the applicable authorities, the Court concludes that the motions should be granted because the Plaintiff failed to meet his burden to demonstrate that Sgt. Espinoza violated Benjamin Tellez's constitutional rights, considering the whole record, the videos, pictures, and the undisputed facts in this case.  The Court also concludes, viewing the totality of the circumstances, that it was objectively reasonable as a matter of law for Sgt. Espinoza to believe that Benjamin Tellez posed an immediate threat of serious bodily harm to Sgt. Espinoza and also reasonable, therefore, to use deadly force.

## LEGAL STANDARDS

Summary judgment generally is appropriate when a court determines that "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a)[1] ; *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) (noting that a summary judgment movant need not negate all the nonmovant's claims, but need only point to an "absence of evidence to support the nonmoving party's case"). "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for

---

[1]Rule 56 was amended, effective December 1, 2010. The summary judgment standard previously enumerated in subsection (c) was moved to subsection (a), and there was one word change from the previous version – genuine 'issue' became genuine 'dispute.' *See* FED. R. CIV. P. 56 advisory committee note (2010 Amendments). But the "standard for granting summary judgment remains unchanged." *Id.*

summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Rather, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

The standard for analyzing a motion for summary judgment shifts, however, if, as here, a defendant raises qualified immunity as a defense in a lawsuit brought under 42 U.S.C. § 1983. "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). "If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment-showing that there are no genuine issues of material fact and that he . . . is entitled to judgment as a matter of law." *Clark v. Edmunds*, 513 F.3d 1219, 1222 (10th Cir. 2008) (internal quotation marks omitted). "To establish a constitutional violation, the plaintiff must demonstrate the force used was objectively unreasonable." *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1259 (10th Cir. 2008). "We assess objective reasonableness based on whether the totality of the circumstances justified the use of force, and pay careful attention to the facts and circumstances of the particular case." *Id.* at 1260 (internal quotation marks omitted). "A reasonable officer need not await the 'glint of steel' before taking self-protective

action; by then, it is 'often ... too late to take safety precautions.'" *Id.* "In determining whether a plaintiff's constitutional rights were violated we ordinarily, as here, adopt plaintiff's version of the facts, insofar as it is supported by the record." *Thomson v. Salt Lake County*, 584 F.3d 1304, 1318 (10th Cir. 2009).

> It is well established that the use of "deadly force is justified under the Fourth Amendment if a reasonable officer in the [d]efendant's position would have had probable cause to believe that there was a threat of serious physical harm to themselves or to others." *Walker v. City of Orem*, 451 F.3d 1139, 1159 (10th Cir. 2006) (quotation omitted). In assessing the "degree of threat" facing an officer, we consider several factors, including: "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008).

*Samuel v. City of Broken Arrow, Okla.*, No. 11–5166, 2012 WL 6634590, *1 (10th Cir. Dec. 21, 2012) (unpublished). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97. "[O]nce [the court has] determined the relevant set of facts and drawn all inferences in favor of the nonmoving party *to the extent*

4

*supportable by the record*, . . . the reasonableness of [the officer's] actions [in using deadly force]. . . is a pure question of law."   *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007) (emphasis in original).  Consistent with the Supreme Court's opinion in *Scott*, the Honorable Jerome A. Holmes of the Tenth Circuit Court of Appeals wrote, in a concurring opinion, a very useful discussion for district courts that sheds "some clarifying light on the process of applying the summary judgment standard of review in the qualified immunity setting."   *Thomson*, 584 F.3d at 1326 (Holmes, J., concurring).

> In addressing the legal issue in the qualified immunity context of a violation *vel non* of a clearly established constitutional right, however, the principal purpose of assessing whether plaintiff's evidence gives rise to genuine issues of material fact is different than it is in the traditional summary judgment analytic paradigm.  Specifically, contrary to the latter, the objective is not to determine whether a plaintiff survives summary judgment because plaintiff's evidence raises material issues that warrant resolution by a jury.  Instead, the principal purpose is to determine whether plaintiff's factual allegations are sufficiently grounded in the record such that they may permissibly comprise the universe of facts that will serve as the foundation for answering the legal question before the court. . . .

> It is only *after* plaintiff crosses the legal hurdle comprised of his or her two-part burden of demonstrating the violation of a constitutional right that was clearly established, that courts should be concerned with the *true* factual landscape—as opposed to the factual landscape as plaintiff would have it.  Based upon that true factual landscape, courts should determine whether defendant can carry the traditional summary judgment burden of establishing that there are no genuine issues of material fact for jury resolution and that defendant is entitled to judgment as a matter of law.  *See Medina v. Cram*, 252 F.3d 1124, 1128

(10th Cir. 2001) ("If the plaintiff successfully establishes the violation of a clearly established right, the burden shifts to the defendant, who must prove that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." (internal quotation marks omitted)); *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1186 (10th Cir. 2001) (quoting *Medina* ); *see also Gallegos v. City & County of Denver*, 984 F.2d 358, 361 (10th Cir.1993) ("Only after plaintiff has met this initial [two-part qualified immunity] burden does the burden shift to defendants to prove that no genuine issue of material fact exists.") . . . . .

*Id.* at 1326-27 (footnote omitted).

## UNDERLYING FACTS

Around 9:00 p.m. on June 4, 2010, Sgt. Espinoza was patrolling in Belen as part of his duties as an officer with the Belen Police Department.  *See* Doc. 19-1 at 1, ¶ 2 (Espinoza Affidavit).  Andres Tellez was washing his truck that was parked on the west side of the street in front of his house at 601 N. 4th Street, located on the northwest corner of N. 4th Street and Ross, and which faces east.  *See* Doc. 25-2 at 6 (drawing of house and positions of truck, Sgt. Espinoza's police car, path that Sgt. Espinoza took during the incident, and place where shooting occurred as described by Andres on the night of shooting); Doc. 27-1 at 5 (Andres' 6/4/10 victim/witness transcribed interview); Doc. 19-1 at 1, ¶ 3.  At 9:07-:08 p.m., Police Dispatch transmitted to officers that it had received a 911 call in which Shawn Davis reported that two men – Andres and his brother, Benjamin Tellez – were fighting in Davis's neighbor's (Andres's) yard, and that one of the men "had a rifle and was threatening

to kill the other" man. *See* Doc. 19-1 at 2, ¶ 3; Doc. 19-6 at 1-2, ¶¶ 3, 7 (Shawn Davis Affidavit); Doc. 19-8 at 1 (Police Emergency Call Record Narrative stating that "Shawn" reported that "there are two subjects fighting[,] one has a rifle[,] one is advising that he is going to kill the other one," and that Shawn stated, "it is too dark to see a description"[2]).   Shawn Davis and her husband Jimmy, who also witnessed the events, state that they heard Benjamin say that he hated Andres and was "gonna kill" him; that they saw Benjamin take "something out of a coat or bag that looked like a gun," and which they believed "was a rifle;" and that Benjamin began chasing Andres around the truck.  Doc. 19-6 at 1-2, ¶¶ 5-8 (Shawn Davis Affidavit); Doc. 19-7 at 1-2, ¶¶ 6-8 (Jimmy Davis Affidavit).  Benjamin had a long, sharpened spear, with which he stabbed Andres in the arm; Andres tried to defensively hit Benjamin with a shovel after Benjamin continued to "stab at" him, but the shovel hit the fence; Benjamin rammed the spear through the fence; and then Andres ran into the house.  Doc. 27-1 at 5 (transcript of Andres's 6/4/10 interview); *see* Doc. 19-4 at 2 (picture of spear in fence). Benjamin ran after Andres and started "beating on the door and breaking the

---

[2]   The Court takes judicial notice that, on June 4, 2010, sunset in Belen, NM was at 8:17 p.m.,   *see*   http://weatherspark.com/averages/30128/6/Belen-New-Mexico-United-States;   and astronomical twilight commenced at 9:01 p.m.  *See* Astronomical Twilight Table for 2010 for Belen, NM, from the Astronomical Applications Dep't. of U. S. Naval Observatory, found at http://aa.usno.navy.mil/cgi-bin/aa_rstablew.pl.  Astronomical Twighlight is the time "when the center of the sun is between 12° and 18° below the horizon" and at which time "most casual observers would consider the entire sky fully dark even when astronomical twilight is just beginning in the evening."  *See* http://en.wikipedia.org/wiki/Twilight#Astronomical_twilight.

glass." Doc. 27-1 at 5.  At that point, Andres also called 911.  *See id.*

Officer Espinoza, who was patrolling only a block away, arrived at the scene while both Andres and Shawn were still talking to the 911 operator.  *See id.*; Doc. 19-6 at 2, ¶ 10; Doc. 19-1 at 2, ¶ 4.  Sgt. Espinoza had heard Dispatch say that "one person  was carrying a rifle and threatening to kill the other." Doc. 19-1 at 2, ¶ 5.  As he arrived on Ross and parked at the northeast corner of Ross and 4th facing Andres' house, *see* Doc. 25-2 at 6, he saw Benjamin "beating on [Andres'] door" with what looked to Sgt. Espinoza to be a rifle, and he jumped out of the car with his gun drawn, shouting, "Police, stop." Doc. 19-1 at 2, ¶¶ 5-6 (Espinoza affidavit).  Benjamin ran out of the yard, and, "with the gun, [] started walking north toward [the Davis's] house in a threatening manner."  Doc. 19-7 at 2, ¶9 (Jimmy Davis Affidavit); Doc. 19-6 at 2, ¶ 9 (Shawn Davis Affidavit) (accord).  As Sgt. Espinoza ran diagonally across the street toward Benjamin, and Benjamin began walking north on 4th, Andres' truck that was parked in front of the house partially obscured Sgt. Espinoza's view of Benjamin for a time, but he continued to shout at Benjamin to "drop it" and Benjamin shouted "fuck you, motherfucker.  Shoot me.  Suicide by cop." Doc. 19-1 at 2, ¶¶ 8-9; *see* Doc. 25-2 at 6.  During the 911 call, Andres, who had opened the door at the point when Andres had run out of the fenced yard and was already walking north up 4th, was now standing on his porch in front of the front door.  *See* Doc. 27-1 at 5 (Andres'

8

6/4/10 testimony that "I was [inside the house] on the phone with 911, and I heard [Benjamin] running back out to the street. I opened the door, you know, to see where he was at, and I saw the officer . . . and he came running out of his car, you know, gun drawn telling him, 'Drop it. Drop it'"); *id.* at 8 (Andres's 6/4/10 testimony that, when he opened the door, Benjamin was  "running outside of the yard.  The officer comes running out after him.  I'm on the phone with 911.  I said, 'The officers are here.'"); *id.* at 9 (Andres' 6/4/10 testimony as follows:  question:  "the circle is . . . where the officer fired the shot from?"  Andres: "Yes."  Question: "Okay. And you were at your front door?"  Andres: "I was right on the front door."); *id.* at 10 (Andres' 6/4/10 testimony that, "From the time that he left my door to me opening the door and looking out, that officer was coming, and [Benjamin] was already moving -- he was already way out there [walking up 4th street]").  Andres told the 911 operator that Benjamin had "stabbed him in the arm."  Doc. 19-8 at 1 (Police Emergency Call Record Narrative).  After he approached the house/yard area and Benjamin, Sgt. Espinoza states that he saw the spear sticking in the fence and heard Andres say, "he just stabbed me," apparently to the 911 operator to whom Andres was talking.  Doc. 19-1 at 3, ¶ 17; Doc. 19-8 at 1 (Police Emergency Call Record Narrative); Doc. 27-1 at 10 (Andres' 6/4/10 testimony that he told the 911 operator that, "my brother is breaking in my windows.  He's attacking me.  I believe he stabbed me.").

9

As he got closer to Benjamin, Sgt. Espinoza recognized Benjamin because of his prior dealings with him. *See* Doc. 19-1 at 3, ¶ 13. He was surprised to see that Benjamin was continuing to behave violently and was cursing at him because, in the past, when Sgt. Espinoza had been called to scenes at which Benjamin had been violent, Benjamin calmed down and complied with officers' instructions. *See* Doc. 19-1 at 3, ¶¶ 13-14. Sgt. Espinoza knew that Benjamin, who was only 29 years old, used methamphetamines so often that Benjamin was going to have all of his teeth pulled. *Id.* at 2, ¶ 12.

As he ran or walked quickly around the truck that was between him and Benjamin, *see* Doc. 25-2 at 6 (Andres' drawing showing that Sgt. Espinoza walked diagonally toward the house, and that the truck was parked between where Sgt. Espinoza and Benjamin were walking); Doc. 27-1 at 9 (Andres' 6/4/10 testimony explaining where everyone was); Doc. 19-1 at 2, ¶ 8, Sgt. Espinoza continued to shout at Benjamin to drop the weapon, at which point he saw that Benjamin had "a duffel bag draped over the weapon," but Benjamin kept walking away and shouting at Sgt. Espinoza. Doc. 19-1 at 3, ¶ 15; Doc. 27-1 at 8. Benjamin then stopped at the neighbor's driveway, "turned toward the officer in an aggressive manner," and continued to shout at Sgt. Espinoza. Doc. 19-6 at 2, ¶¶ 10-11(Shawn Davis affidavit); Doc. 19-7 at 2, ¶¶ 10-11 (Jimmy Davis affidavit); Doc. 19-1 at 3, ¶ 19 (Sgt.

10

Espinoza's affidavit); Doc. 27-1 at 5 (Andres' 6/4/10 testimony that Sgt. Espinoza "came running out of his car, you know, gun drawn telling him, 'Drop it. Drop it.' And I was still on the phone with 911 talking to them watching the officer run at him. He, Benjamin starts yelling something at him. I don't know quite what he yelled at him.").

Andres stated on the night of the incident that Benjamin continued yelling "something" that Andres could not hear at Sgt. Espinoza, and then he saw that Benjamin had "pick[ed] up his bag . . . he starts messing with the bag." Doc. 27-1 at 5. Andres stated that he saw Benjamin "pulling [something] out of his bag." Doc. 27-1 at 8. When Sgt. Espinoza got closer to Benjamin, he saw the bag drop and what "appeared to be a rifle with a black barrel, a brown forestock, and a pistol grip." Doc. 19-1 at 4, ¶ 21. Sgt. Espinoza yelled at Benjamin to "put it down, put it down," but Benjamin "did not comply." *Id.* at 4, ¶¶ 22, 23; Doc. 27-1 at 9 (Andres' interview statement that Sgt. Espinoza was yelling "put it down, put it down," but Benjamin "started yelling something and grabbed his bag, started pulling out whatever he had in the bag"); Doc. 19-7 at 2, ¶¶ 12-14 (Jimmy Davis' affidavit stating that, just before the shot, Benjamin "did not drop what he was carrying, instead continued to hold the gun in a threatening manner" after Sgt. Espinoza told Benjamin to "drop it"); Doc. 19-6 at 2, ¶¶ 12-15 (Shawn Davis' affidavit stating that, just before the shot, Sgt.

Espinoza was yelling at Benjamin to "drop it, put it down" and Benjamin was yelling back at him).

Sgt. Espinoza, who was now only a few feet away from Benjamin, states that he heard Benjamin say, "I swear I'll shoot you," saw him begin to raise the gun, "believed that his life was in imminent danger," and fired his weapon once at Benjamin, hitting him in the chest. Doc. 19-1 at 4, ¶¶ 23-25. The whole incident from the time Sgt. Espinoza arrived and when the shot was fired, lasted less than two minutes. *See* Doc. 19-8 at 1 (showing that dispatch radioed message at 9:08 to Sgt. Espinoza and that at 9:09:49 Officer Benavidez advised that "shots fired . . . one subject down"); *cf.* Doc. 26, Ex. C (first-arriving police-car video showing that tape started running at 21:05:15 when radioed call came in and 21:07:37 when the officer arrived at scene and saw that Benjamin had already been shot). Jimmy Davis saw Benjamin fall to the ground and saw Sgt. Espinoza "kick[] the gun away." Doc. 19-7 at 2, ¶ 15.

Sgt. Espinoza identified pictures of the weapon and a duffel bag taken at the scene, as well as a picture of the spear Benjamin had used to stab Andres. *See* Doc. 19-1 at 4, ¶ 26; Doc. 19-2 at 1 (picture of scene showing location of truck and driveway where Benjamin was shot and showing shapes of bag and gun at the east end of the sidewalk where it meets the driveway); Doc. 19-3 at 1, 2 (close-up pictures of

12

gun and duffel bag at junction of sidewalk and driveway).  At his interview the night of the incident, after learning that Benjamin had died as a result of the gunshot wound, Andres stated that he knew that Sgt. Espinoza "did what he had to do."  Doc. 27-1 at 14.

Tellez submits a video taken from the first police car that arrived at the scene immediately after Benjamin was shot.  *See* Doc. 26, Ex. C.  The video shows that, at the time of the incident, the sky was almost fully dark except when looking directly at the western horizon; that the only streetlight at the scene is on the southwest corner of 4th and Ross; that a large tree partially obscures the light from the streetlight from Andres' yard; that Andres' house had no porch light on; and that the neighbor-to-the-north's porch light was not on.  *See* Ex. C.  The video also shows that Sgt. Espinoza's headlights pointed straight west up Ross and did not illuminate Andres' yard or house at all.  Until the officer's headlights reach where Sgt. Espinoza is standing, it is virtually impossible to see him at all.  In short, the area where Benjamin and Sgt. Espinoza had their encounter was very dark and only dimly lit by the streelight.  Only Andres's shadowy outline can be seen; he is still standing on the front porch.  The police car's headlights are shining on Benjamin, who was still alive, and who was lying on his left side in the neighbor's driveway with his head pointed west toward the sidewalk that crossed the driveway.  Sgt. Espinoza was waiting in the street, telling

Benjamin to "stay down."  When the arriving officer walks up to Benjamin and shines his flashlight around Benjamin, he shines it farther west up the driveway from Benjamin's head, toward the sidewalk and asks, "Is this the gun?" to which Sgt. Espinoza states, "yes."  A minute or so later, the officer begins to question Andres and asks: "Is that the only gun he had – is the one he pulled?"  Andres, who apparently had not heard the officers talking about the gun, responded, "he had a gun?" Ex. C.  The officer replied: "yeah, he pointed it at the officer - that's why he got shot."  Ex. C.  An officer then walks over to the driveway and shines his flashlight on the gun, and the officer talking with Andres said, "right there."  Ex. C.  As it turned out, the gun was only a black plastic pellet or toy gun with duct tape wrapped around the pistol grip. *See* Doc. 27-1 at 8 (State Police Officer Nick Carlson's 6/4/10 interview with Andres in which Officer Carlson states: "I was told that there was a BB gun or a broken toy gun in the front yard."  Andres: "I'm assuming that's the gun he was pulling out of his bag.  That's what I was told."  Officer Carlson: "Who told you that?"  Andres: "The officers.  They said, 'Did you know he had the gun?'  I didn't – and I didn't know he had anything else.  All I know is he had a bag, and I'm assuming that's what he was pulling out of his bag."); Doc. 19-3 at 1, 2 (pictures of gun at scene).

Blood tests showed that, at the time of the incident, Benjamin's blood-alcohol level was .14-.17 and that he had methamphetamines in his system.  *See* Doc. 19-9

(autopsy report).

### TELLEZ'S SUMMARY-JUDGMENT EVIDENCE

As noted above, Andres gave a taped witness/victim statement the night of the incident that is consistent with both the Davises' and Espinoza's affidavits submitted on summary judgment and with the police video and pictures. But after Tellez sued Sgt. Espinoza and the City of Belen on behalf of Benjamin's estate and the Defendants moved for summary judgment, Tellez submitted an affidavit Andres (who likely is a beneficiary of his brother's estate) prepared over two years later that significantly contradicts Andres' original contemporaneous statements in an attempt to create a genuine issue of material fact regarding whether Benjamin verbally threatened to shoot Sgt. Espinoza and whether he had a gun in his hands. As noted above, on June 4, 2010, Andres stated that he was initially inside the house, talking with the 911 operator, when Sgt. Espinoza arrived, and he did not come outside until Benjamin quit pounding on his door, ran out of the yard, and started walking up the sidewalk on N. 4th street. *See* Doc. 25-2, ¶¶ 13-15. Andres originally repeatedly stated that he could **not** hear what Benjamin yelled at Sgt. Espinoza either the first time Sgt. Espinoza told him to stop pounding on the door and "drop it" or the second time, when Sgt. Espinoza told him to "put it down." *See* Doc. 25-2 at 5 ("I was on the phone with 911, and I heard [Benjamin] running back out to the street. I opened the door, you know,

to see where he was at, and I saw the officer . . . telling him, 'Drop it, drop it.'  And I was still on the phone with 911 talking to them watching the officer run at him.  He, Benjamin, starts yelling something at him.  I don't know quite what he yelled at him."); Doc. 25-2 at 8 (I'm on the phone with 911. . . . I heard [Benjamin] running away from the door so I opened the door to see where he's going.  And I look, I see an officer pulling up to the stop sign . . . .  And [Benjamin is] running outside of the yard.  The officer comes running out after him.  I'm on the phone with 911.  I said, 'The officers are here.'  He – the officer –  started yelling at him, 911 is asking me a couple more questions:  Are they – you know, where are you at?  What's your name?  I was responding to that, watching the officer yell and chase him.  Benjamin stops.  He gets to the edge of the yard on the outside, the edge where he was found.  He stops there.  He starts yelling back at the officer, grabs his bag and there's where I heard the pop."); Doc. 25-2 at 9 ("Benjamin was . . . standing right there [at the rear passenger side of the truck].  The officer was approaching him, gun drawn, you know, yelling at him, 'Put it down. Put it down.'  And [Benjamin] started yelling something back and grabbed his bag, started pulling out whatever he had in the bag, and that's when I heard the pop."); Doc. 25-2 at 10 (Question: "You don't remember what your brother was saying to the officer?"  Andres: "No. He was yelling.  I don't know exactly what he was saying."  Question: "Did you hear what [the officer] was saying?"

Andres: "The officer was telling him to drop it.  That's what I heard him saying, 'Drop it.' . . . When I walked out the door, that officer was already there.").

Thus, although he previously repeatedly testified that he could not understand what Benjamin was yelling (apparently because Andres was undisputedly still having a conversation with the 911 operator during the entire incident), and he clearly was farther away from Benjamin than Officer Espinoza was, Andres now purports to know what Benjamin did **not** yell at Sgt. Espinoza, contending (in contradiction to Sgt. Espinoza's testimony) that: "Benjamin Tellez never yelled, . . . 'I swear I'll shoot you." Doc. 25-2 at 4, ¶ 37.

Andres' affidavit also now places Andres closer to Benjamin than Andres stated that he was at the time of the shooting; he now describes the lighting as less dark and his ability to see Benjamin as more clear than he had previously testified; and he now purports to know that Benjamin was **not** carrying a duffel bag and a gun before he was shot.  Despite his prior testimony that he was standing **inside** the house when Sgt. Espinoza drove up, and that he then stood on his front porch in front of his door while talking to the 911 operator, *see* Doc. 27-1 at 9-10, he now states that he walked out to the "sidewalk in front of my porch" while telling the 911 operator that Sgt. Espinoza had arrived.  Doc. 25-2 at 18.  In his previous statement regarding the lighting and what he could see, Andres stated that it was very dim and he could only see his

brother's shape but could not see what he had in his hands other than his bag. *See* Doc. 25-2 at 1-12 (Question: "How is the lighting at your house?"  Andres: " The lighting?"  Question:  "Could you see?"  Andres: "It's fairly dark, other than the street light right there."   Question: "Is there any street lights where your brother was standing?"  Andres: "No. He was kind of away from the street lights. . . . I mean, you still have a little bit of light that kind of lingers over there.  I couldn't see him clearly to be able to see him with something in his hand, but you could see him that he had his bag and he was reaching for something.  I didn't –  you know, I couldn't make out specific shapes right there.  I could see – still see him. . . . The street light was the only real light going in there right there.  Possibly the neighbor's light from his porch, but that's not a lot . . . . [T]he main light was that street light.  That was lighting everything.  [Sgt. Espinoza's] headlights were pointing . . . directly down Ross, so they weren't in [Benjamin's] direction at all."). Doc. 25-2 at 11 (Question: "Did you see anything in your brother's hands . . . [w]henever the officer shot him?"  Andres: "No.  I had seen just his bag. That's all I remember him is reaching for his bag and messing with that, like trying to pull something out of it when the officer shot him."). Andres' first description of the lighting is entirely consistent with the police video. In his new affidavit, Andres now states that "[i]t was dusk but not dark, and the area in front of my home was well lit from the street light at the corner of 4th and Ross and

the headlights from the officer's vehicle."  Doc. 25-2 at 2, ¶ 17.

And, contrary to his prior statements that, just before Officer Espinoza shot

him, Benjamin "pick[ed] up his bag" Doc. 27-1 at 5, and that he saw Benjamin

"pulling [something] out of his bag," but could not tell what it was or see anything but

shapes in the darkness, Doc. 27-1 at 8,10, Andres now swears that Benjamin "did not

have anything in his hands," nor did he have "a duffle bag draped over a weapon."

Doc. 25-2 at 3, ¶¶ 13-14; *see* Doc. 25-2 at 5, ¶ 51 (stating that "Benjamin Tellez had

not been carrying the duffel bag depicted and had not been carrying the weapon

shown in the exhibits").

Tellez also submits an affidavit from Gonzalo Jimenez, another neighbor who

lives 300 feet north and across from Andres' house, and who was backing his vehicle

out of his driveway when the incident occurred.  *See* Doc. 25-1 at 1, ¶¶ 2-5.  Jimenez

states that, despite being 300 feet away in a car at night, he could see Sgt. Espinoza

and Benjamin "clearly," that Benjamin was "walking backwards away from the

officer."  *Id.* 1, ¶ 7.  He states that "the police officer yelled, 'Drop it,'" and shot

Benjamin about 10 seconds later; that he "did not hear Benjamin Tellez yell or say

anything to the officer before he was shot," and that he "could not see a gun in

Benjamin Tellez's hands at the time he was shot" but that Benjamin "was wearing a

dark colored back pack at the time he was shot."  *Id.* at 1-2, ¶¶ 8-12.  He also states

that Benjamin "was not threatening Sgt. Espinoza."  *Id.* at 2, ¶ 13.

## ANALYSIS

**1.  Andres' affidavit is not based on personal knowledge; does not establish that Sgt. Espinoza violated Benjamin's constitutional rights; and does not create a genuine issue of material fact regarding the reasonable use of deadly force**.

It seems clear to the Court that Andres is attempting to testify to things that were not within his personal knowledge at the time of the incident on the issues of whether Benjamin was holding a gun that he refused to drop before Sgt. Espinoza shot him and whether Benjamin verbally threatened Sgt. Espinoza.  It is also clear that the Court should not consider certain "facts" from Andres' affidavit that are contradictory to the video and the pictures taken at the scene.

The Court may not consider any portion of an affidavit for which the evidence does not support a finding of personal knowledge.  *See* Fed. R. Civ. P. 56 (c)(4) ("An affidavit or declaration used to . . . oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated."); Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."). Where a witness has previously admitted to a lack of knowledge on a particular matter, the question of

personal knowledge is easily resolved.  "Under the personal knowledge standard, an affidavit is inadmissible if the witness could not have actually perceived or observed that which he testifies to." *Argo v. Blue Cross & Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1200 (10th Cir. 2006) (internal quotation marks deleted) (affirming district court's decision to disregard paragraphs of an affidavit where affiant admitted to lacking knowledge as to the matters testified to).

Andres' prior undisputed testimony shows that he spent much of his time running away from Benjamin to escape Benjamin's attack; that he was inside the house where he could not see Benjamin's actions for a period of time[3]; and that when he came back outside, Benjamin was standing far enough away from him that Andres could only make out his shape, a "bag", and Benjamin's movements in the very dim light.  In the circumstance in which Andres has previously repeatedly testified that he could not hear what Benjamin shouted back at Sgt. Espinoza, and he does not now affirmatively state what he **did** hear Benjamin state, other than "fuck you" (which Benjamin said in response to Sgt. Espinoza telling him to stop and drop the object Benjamin was using to pound on the door), the Court concludes that Andres is not competent to testify about what Benjamin did not say immediately before Sgt.

---

[3] The Court finds Andres to be incompetent to testify about what Benjamin used to pound on his door, as Andres undisputedly was inside the house with the door shut and unable to see Benjamin at that time.

Espinoza fired his weapon, and the Court will disregard his testimony.  Sgt. Espinoza's testimony that Benjamin yelled that he would shoot Sgt. Espinoza when Sgt. Espinoza was facing, and only a few feet from, Benjamin is, therefore, undisputed by Andres.

Similarly, in the circumstance in which Andres has already stated that, from where he was standing on the porch in relation to where Benjamin was shot in the neighbor's driveway he could not see what Benjamin pulled out of his bag or had in his hands, and the video supports his prior statements that it was too dark to see Benjamin clearly from where he was standing, the Court finds Andres to be incompetent to testify that Benjamin was **not** holding a duffel bag and a gun before he was shot and  will disregard that part of his affidavit.  Nothing disputes Jimmy and Shawn Davis's and Sgt. Espinoza's testimony that, before Sgt. Espinoza said "drop it," Benjamin had a gun and Benjamin did not drop the gun.

Further, Andres' new version of the facts regarding how light the sky was and how well lit it was at his home[4] are "so utterly discredited by the [videotaped] record that no reasonable jury could" believe it.  *Scott*, 550 U.S. at 380-81 (holding that because "[t]he videotape quite clearly contradicts the [motorist's] version" of how dangerously he was driving, the court "should have viewed the facts in the light

---

[4]  The still picture of the scene also shows that the street light is located across Ross from Andres' house and that a large tree shades part of the light from Andres' yard.  *See* Doc. 19-2 at 1.

depicted by the videotape").

Andres also now states that "there was no gun on the ground near Benjamin Tellez," Doc. 25-2 at 4, ¶ 43, but he was still on the phone with the 911 operator when Benjamin fell to the ground; there is no testimony or evidence that Andres examined the area around Benjamin's body after the shooting; the video shows the position of the gun and duffel bag in the area just east of where Benjamin was laying and the officer pointing to the gun when he arrived and then to Andres immediately after the shooting, and Andres states that the police who arrived immediately "began roping off the yard." *Id.* ¶ 46. Counsel's suggestion that Benjamin didn't have a gun simply because it was not next to his body after he fell does not create a genuine issue of material fact, especially in light of the video showing the officers who were not involved in the shooting immediately identifying the gun nearby. Andres has failed to supply evidence showing that he is competent to testify regarding whether Benjamin had a gun or what was on the ground and his suggestion that Benjamin did not have a gun cannot be considered in light of the video taken immediately after the shooting and the pictures showing the gun in the area where Benjamin was shot. *See Scott*, 550 U.S. at 380-81.

**B. Jimenez's affidavit does not establish that Sgt. Espinoza violated Benjamin's constitutional rights; does not contradict essential facts in the record; and he is**

**not competent to testify about whether Benjamin threatened Sgt. Espinoza.**

The Court finds that Jimenez's affidavit also does not actually contradict the Davis's, Sgt. Espinoza's and Andres's original testimony about the events.  It is not surprising that Jimenez did not hear Benjamin say anything or see a gun in Benjamin's hand when Jimenez was 300 feet away in a car in virtual darkness and Benjamin had his back to Jimenez as he faced Sgt. Espinoza.  The facts that Jimenez was too far away to hear what Benjamin said and that Jimenez only saw Benjamin backing away north from Sgt. Espinoza as Jimenez was looking south does not mean that Benjamin did not say anything or that he was not holding the gun in a position where Jimenez could not see it.  Jimenez is also not competent to testify that Benjamin did not threaten Sgt. Espinoza in the circumstances in which he could not hear what Benjamin was saying and could not see the front of Benjamin's body.

The factual allegations Tellez now presents regarding whether Benjamin had a gun and whether he verbally threatened Sgt. Espinoza are not "sufficiently grounded in the record such that they may permissibly comprise the universe of facts that will serve as the foundation for answering the legal question before the court," *Thomson*, 584 F.3d at 1326, which is whether Sgt. Espinoza violated Benjamin's constitutional right to be free from an unreasonable seizure.  And, as discussed below, neither Andres' new testimony nor Jimenez's testimony create any doubt, considering the

24

totality of the undisputed circumstances presented by the rest of the summary-judgment record, that Sgt. Espinoza's actions were objectively reasonable.

**C.  Sgt. Espinoza's use of deadly force was reasonable as a matter of law and he did not violate Benjamin's constitutional rights.**

The Court concludes that the reasonableness of Sgt. Espinoza's behavior, use of deadly force, and claim of self defense rest on the totality of the circumstances, including the risky physical situation in which he found himself while carrying out his police duties; what he had undisputedly been told through Dispatch by eye witnesses; what he knew about Benjamin's methamphetamine use and erratic behavior; what Andres, the assault and battery victim, yelled during the incident; what Sgt. Espinoza saw when he got closer to Benjamin; and what Benjamin did after Sgt. Espinoza repeatedly told him to drop the gun. *See Thomson*, 584 F.3d at 1318 ("It is the totality of the circumstances that is the touchstone of the reasonableness inquiry.")

In the situation where Sgt. Espinoza undisputedly arrived at a violent crime scene after astronomical twilight and where lighting was very dim; where 911 witnesses reported that Benjamin had a rifle and had threatened to kill Andres; where Sgt. Espinoza saw Benjamin pounding on Andres' door on the unlit front porch with what looked to him like a rifle; where Andres yelled that Benjamin had just stabbed him; where Sgt. Espinoza knew that Benjamin used methamphetamines and was

acting erratically and out of character and cursing at him; where Sgt. Espinoza heard Benjamin threaten to shoot Sgt. Espinoza and saw a gun in Benjamin's hands pointed toward him; where Sgt. Espinoza was only a few feet from Benjamin when he repeatedly ordered Benjamin to drop the gun but Benjamin refused to comply before Sgt. Espinoza fired his weapon, and where the video and pictures show the gun and the bag immediately after the shooting in the area where Benjamin fell, the Court concludes as a matter of law that Sgt. Espinoza's use of deadly force was justified and reasonable because a reasonable officer in Sgt. Espinoza's position would have probable cause to believe that Benjamin caused a threat of serious physical harm to Sgt. Espinoza or others. *See Walker*, 451 F.3d at 1159; *Thomson*, 584 F.3d at 1318 (holding that " the totality of the circumstances indicates that it was reasonable for the officers to believe that Mr. Thomson was an immediate threat to them or to others in the neighborhood. Mr. Thomson was in possession of a firearm, was known to have threatened his wife with a firearm, and had not put his weapon down as instructed by the officers.").  Therefore, Sgt. Espinoza did not violate Benjamin's constitutional rights and is entitled to qualified immunity. *See Estate of Larsen*, 511 F.3d at 1260; *Thomson*, 584 F.3d at 1324 (affirming grant of qualified immunity on summary judgment because the "Plaintiffs failed to establish a constitutional violation under the Fourth Amendment because they did not meet their burden of demonstrating that . .

. the shooting of Mr. Thomson was objectively unreasonable under the circumstances").

"A § 1983 suit against a municipality for the actions of its police officers requires proof that (1) an officer committed a constitutional violation and (2) a municipal policy or custom was the moving force behind the constitutional deprivation that occurred." *Estate of Larsen,* 511 F.3d at 1264. "But without the predicate constitutional harm inflicted by an officer, no municipal liability exists." *Id.* The Court will, therefore, also grant summary judgment on Tellez's § 1983 claims against the City of Belen.

And because, under New Mexico state law, homicide by a peace officer is justifiable when it is "necessarily committed . . . in the discharge of any other legal duty"; and "is necessarily committed when a public officer or public employee has probable cause to believe he or another is threatened with serious harm or deadly force while performing those lawful duties described in this section," N.M.S.A. § 30-2-6, the Court will grant summary judgment in favor of both Defendants on Tellez's state-law claims.

There is no doubt that Benjamin's death was a regrettable tragedy. But the Court must recognize that officers are "often forced to make split-second judgments ... about the amount of force that is necessary in a particular situation." *Graham*, 490

U.S. at 396–97.  Because Tellez failed to demonstrate that Sgt. Espinoza violated Benjamin's constitutional rights, and because Sgt. Espinoza acted reasonably under the totality of the circumstances as a matter of law, the Court will grant summary judgment in favor of the Defendants on all of Tellez's claims.

**IT IS ORDERED** that the Defendants' motion for summary judgment [Doc. 19] is GRANTED and Tellez's claims are dismissed with prejudice.


_____
**UNITED STATES DISTRICT JUDGE**